Nott, J.,
delivered the opinion of the court:
This is an action to recover back money which was exacted by the direct-tax commissioners in Charleston, S. C., as interest at the rate of 10 per cent, from July 1,1862. The tax was paid May 26, 1865, being more than sixty days from March 6,1865, the date when the commissioners “ fixed the amount of the tax.” The facts, therefore, are identical with those in the recent case of Simons (19 O. Cls. R., 601), but owing to some obscurities in the opinion in that case the Secretary of the Treasury has very properly requested the opinion of the court in this.
• In the Simons Case three important questions were presented, viz: Whether the tax commissioners could fix the amount of the tax on property within the military lines of the enemy ? Whether interest at the rate of 10 per cent, upon an unpaid tax could be charged and exacted for a period anterior to the time when the tax was fixed ? Whether the statute of limitations barred the action? Upon the determination of these questions it appeared clear to the court, under the decisions in the Proclamation Oases (31 C. Cls. R., 72; affirmed 13 id., 562), that the officers of the government having illegally exacted a *177 sum of money from the claimant, be was entitled to recover it back. Whether the government was entitled to withhold from that sum the trivial amount of $2.40 for interest during the period of sixty-one days that the tax remained unpaid, was not considered.
The amount involved did not warrant the court in passing upon the question, and its significance in other cases was not perceived. The court regrets that the oversight should have occasioned trouble to the accounting officers, and now proceeds to determine that point.
The Act for the collection of direct taxes in insurrectionary districts, 1th June, 1862 (12 Stat. L., 422, § 7), as amended by the Act 6th February, 1863 (id., 640), provides a,s follows :
“ That the said board of commissiouers shall be required, in case the taxes charged upon the said lots and parcels of land shall not be paid, as provided for in the third section of this act, to cause the same to be advertised for sale for at least four weeks * * * and by posting notices of said sale in three public places in the town, parish, district, or county, within which said lands are situated, at least four weeks previous to the day of sale; and at the time and place of sale to cause the same to be severally sold to the highest bidder for a sum not less than the taxes, penalty, and costs, and 10 per centum per annum interest on said tax, pursuant to said notice; in all cases where the owner of said lots or parcels of ground shall not, on or before the day of sale, appear in person before the said board of commissioners and pay the amount of said taxj with 10 per centum interest thereon, with the cost of advertising the same, or request the same to be struck oft' to a purchaser for a less sum than two-thirds of the assessed value of said several lots or parcels of ground, the said commissioners shall be authorized at said sale to bid off the same for the United States.”
And the third section therein referred to was in these words:
“ That it shall be lawful for the owner or owners of said lots or parcels of lands, within sixty days after the tax commissioners herein named shall have fixed the amount, to pay the tax thus charged upon the same, respectively, into the Treasury of the United States, or to the commissioners herein appointed, and take a certificate thereof, by virtue whereof the said lands shall be discharged from said tax.” (12 id., 422, § 3.)
The manifest purpose of the third section was to declare it “ lawful” for the owner of realty to pay the “ tax ” charged upon his land, and take a certificate by virtue whereof the land should *178 be discharged from the lien of the tax, provided, nevertheless, that this right should be exercised within “ sixty days” after the amount of the tax had been fixed.
The manifest purpose of the seventh section was to prescribe' what should follow if the owner neglected to pay the tax within the period of grace allowed by the third section.
The seventh section does not declare that if the owner should have neglected to pay his tax at the termination of the sixty days the interest should run from a preceding date, which is the construction contended for by the defendants, but proceeds to give the commissioners certain directions for enforcing the tax. These directions are to proceed against the property, viz, that they shall “ cause the same to be advertised,” and post “ notices” of said “ sale” in certain public places at least four weeks previous to the day of sale.
So far nothing is said about interest, and so far there is no statutory provision authorizing or inflicting it. But the statute then proceeds to direct the commissioners to sell the property “ for a sum not less than the taxes, penalty, and costs, and 10 per centum per annum interest on said tax, pursuant to said notice.” And it also contemplates cases where the owner may appear “ before the day of sale ” and "pay the amount of saidtax, with 10per centum interest thereon, with the cost of advertising the sale.”
In these provisions the “ tax ” referred to is undoubtedly the simple tax which the owner might pay under the third section, and tbe “penalty” is the 59 per centum imposed by the first section, and the “ costs ” are the cost of advertising and posting notices, and the “ interest ” is the interest first authorized by the seventh section. From what time, then, does the seventh section declare this interest shall run 7
The section is silent upon that point, and the time must be ascertained by inference and interpretation. Four starting points at which the interest might begin to run have been suggested:
1. The time when the act 7th June, 1862, went into operation, the 1st July, 1862.
2. The time when the amount of the tax was first legally ascertained, which would also be the beginning of the sixty days during which the owner might pay it.
*179 3. The end of the sixty days, when the commissioners were first authorized to advertise the property.
4. The time when notice of sale was given by advertisement and posting, as prescribed by the seventh section.
As to the first time suggested, it has already been determined by the decision in Simons's Case that interest did not run before a legal assessment of the tax was laid, and the court adheres to that conclusion.
As to the second time suggested, the court is of the opinion that the period of sixty days was the owner’s legal right during which he was not in default, and that the term "interest” should not be turned into a severe and retroactive penalty unless the statute by express words so enacted.
As to the third time suggested, the court is of the opinion that the period of sixty days wherein the owner might pay his tax was analogous to the days of grace which attach to commercial paper, during which a bill of exchange is payable but not due. When the days of grace expire, the penalty and the costs of protest attach and interest begins to run. So in these tax cases the owners were not in default during their period of grace. When it expired they were in default, and then interest properly began to run on what then became a debt due and unpaid.
We are aware that the language of the Supreme Court in Bennett v. Hunter (9 Wall., 326) implies that the right to pay the “ tax ” is not limited to sixty days, but may be exercised at any time prior to sale. But we do not understand that this question of interest was then under consideration, and it does not seem reasonable to this court that the Supreme Court intended that the owner could evade the costs of advertising by payment of the tax alone, and it does not seem probable that the court would have so held when the point was not necessarily involved.
The counsel for the defendants has also asked the court to review its decision concerning the statute of limitations, and he has pointed out what is deemed by him a just distinction between this and the case of Irene Taylor (104 U. S. R., 216).
The court has accordingly reconsidered the question, and states the following as its conclusions:
1. When a right of action exists it must be held that a “ claim first accrues” (Bev. Stat., § 1069) and the statute begins to run *180 from the moment when the claimant may bring his action either upon the entire demand or upon any portion or installment which has become due. Such are the ordinary cases of contract which come before this and alL other courts of law.
' 2. When no right of action exists, and a claimant has no remedy save that of appealing to the justice and clemency of Congress, and Congress pass an enabling act which gives to a claimant or class of claimants a legal right concerning a designated claim or class of claims, the statute of limitations ordinarily begins to run from the passage of the enabling act. Such are the Mail Transportation Cases under the act of 1877, where-the services were rendered before the war, and such are the claims of officers who served in the Mexican war for the three months’ extra pay given by the act of 1879.
But these Direct Tax Cases belong neither to the one nor the other of the above classes. The claimants acquired no right of action by the payment of the money illegally exacted, and therefore the statute of limitations did not begin to run from that date. The Joint Resolution 25th February, 1867 (14 Stat. L., 568, § 4), was general in its terms and prospective as well as retroactive in its benefits. Therefore, the date of its enactment could not furnish a starting point which should apply equally to all claims, those that already existed and those that might thereafter arise.
But the relief given seems to the court much like that given by the Act 5th August, 1861 (12 Stat., 292, § 36), to the owner of real property for a surplus derived from a tax sale. Both statutes relate to money in the Treasury derived through tax proceedings, as to which the government asserts no legal or equitable title. The act provides that the surplus shall be “held for the use of the owner or his legal representatives until he or they shall make application therefor to the Secretary, who, upon such application, shall, by warrant on the Treasury, cause the same to be paid to the applicant.” The joint resolution provides that the Secretary “ shall be authorized to refund to persons from whom money has been received without warrant of law the sums so illegally collected; such refunding to be ordered on the presentation in each case of satisfactory evidence of the illegal collection.” The trust is declared in the act, but it is implied in the joint resolution. Under the one statute the money is to be "paid ” on the " application” of the claimant; *181 under the other it is to be “ refunded” on the “ •presentation” of the claim. In both the legislative purpose is the restitution of money in the Treasury which the government cannot in equity and good conscience retain.
With this close analogy before , us we feel warranted in following the reasoning of the Supreme Court in the Taylor Case and in adopting its conclusion.
The judgment of the court is that the claimant recover the money exacted as interest from the 1st July, 1862, to the 5th May, 1865, being the sum of $31.78.