### The HOPI TRIBE, Plaintiff,

v.

### The UNITED STATES, Defendant.

### No. 97–301L.

United States Court of Federal Claims.

Dec. 27, 2002.

Alfred T. McDonnell, Denver, Colorado, for plaintiff.

R. Anthony Rogers, Washington, D.C., with whom was Assistant Attorney General Thomas L. Sansonetti, for defendant. Maria Wiseman, Office of the Solicitor, U.S. Department of Interior, of counsel.

## *OPINION*

MEROW, Senior Judge.

This action arises out of the Navajo–Hopi Settlement Act of 1974, 88 Stat. 1712, Pub.L. No. 93–531, 25 U.S.C. § 640d, et seq., (1974) ("Settlement Act"), which authorized court action between the Hopi Tribe and the Navajo Nation to partition a reservation created by Congress in 1934. Plaintiff, the Hopi Tribe, contends that defendant's failure to reimburse all of its Settlement Act legal fees and expenses gives rise to a monetary claim under the Tucker Act, 28 U.S.C. § 1491(a)(1), based upon the asserted money mandating nature of § 640d–7(e) or on the basis of a breach of trust. The Hopi Tribe is seeking recovery of costs incurred in Settlement Act litigation from 1986–1989 and 1995–1997.

The matter is now before this Court on defendant's motion to dismiss for lack of subject matter jurisdiction and the parties' cross motions for summary judgement. For the reasons stated below, it is determined that jurisdiction is not present with the result that plaintiff's cross-motion is denied and defendant's motion to dismiss is granted. However, assuming, in the alternative, that jurisdiction is present, plaintiff's motion would be granted in part.

## BACKGROUND

### Navajo–Hopi Settlement Act of 1974

The case comes before this Court as a result of a long-running dispute between the Navajo Nation and the Hopi Tribe over portions of land in Northeastern Arizona. *See Healing v. Jones,* 210 F.Supp. 125, 134 (D.Ariz.1962), *aff'd,* 373 U.S. 758, 83 S.Ct. 1559, 10 L.Ed.2d 703 (1963). In 1868, an executive order led to the creation of a reservation for the Navajo Nation. 15 Stat. 667. In 1882, the United States created a reservation for the Hopi Tribe along with "such other Indians as the Secretary may see fit to settle thereon." Exec. Order of Dec. 16, 1882, *reprinted in, Healing,* 210 F.Supp. at 129, n. 1. In response to conflicting claims to

the land, Congress authorized a lawsuit to resolve the land disputes concerning the reservation created in 1882. Act of July 22, 1958, Pub.L. No. 85–547, 72 Stat. 403. Absent Congressional waiver of the tribes' sovereign immunity, neither the Hopi Tribe nor Navajo Nation could bring suit against the other. *United States v. United States Fid. & Guar. Co.*, 309 U.S. 506, 512, 60 S.Ct. 653, 84 L.Ed. 894 (1940).

In 1934, Congress enacted a statute which declared a larger area as a permanent reservation ("1934 reservation").[1] Navajo Reservation Boundary Act of June 14, 1934, 48 Stat. 960 ("1934 Act"). The 1934 Act described the exterior boundaries of the Navajo Reservation and created a joint interest in the land to the Navajo and "such other Indians as may already be located on." At the time, both the Navajo Nation and Hopi Tribes occupied portions of the land contained in the 1934 reservation. This situation served to exacerbate the disputes between the tribes concerning their respective property rights.

Therefore, Congress held hearings to address, among other issues, a resolution to the Navajo–Hopi land disputes over the 1934 reservation. In 1974, Congress enacted the Settlement Act which authorized a lawsuit between the tribes to reach a final settlement concerning the 1934 reservation. § 640d, et. seq. The Settlement Act authorized the District Court to determine the interests of each tribe in the disputed land and partition it accordingly. § 640d–7(b). A relocation commission was established to implement the Court's relocation order. § 640d–12. Under the Act, the relocation commission was "authorized and directed to relocate pursuant to section 640d–7 of this title and such order all households and members thereof … from any lands partitioned to the tribe of which they are not members." § 640d–13(a). The Settlement Act includes several provisions mandating compensation by the government to those families displaced by the relocation for the costs of purchasing their homes, moving expenses, and replacement dwellings. §§ 640d–13; 640d–14.

Additionally, § 640d–7(e) authorizes payment by the Secretary of the legal fees and related expenses incurred in the Settlement Act litigation:

> The Secretary of the Interior is authorized to pay any or all appropriate legal fees, court costs, and other related expenses arising out of, or in connection with, the commencing of, or defending against, any action brought by the Navajo, San Juan Southern Paiute, or Hopi Tribe under this section.

25 U.S.C. § 640d–7(e).

In 1980, Congress amended the Settlement Act to provide reimbursement of litigation expenses relating to the 1882 reservation: "[T]he Secretary shall pay, subject to the availability of appropriations, attorney's fees, costs and expenses as determined by the Secretary to be reasonable." Pub.L. No. 96–305, 94 Stat. 929, § 640d–27(a). The 1980 amendment specifically provides that this requirement "shall not apply to any action authorized by section 640d–7." § 640d–27(d). In 1988, Congress amended section 640d–7(e) to authorize payment to the San Juan Southern Paiutes for appropriate legal fees relating to the 1934 reservation litigation.

### Department of Interior

Prior to 1974, the Bureau of Indian Affairs ("BIA") had not allocated funds for a tribe's private attorney fees. In a case unrelated to the 1934 reservation litigation, the Commissioner of Indian Affairs, pursuant to 25 U.S.C. § 2, made available funds to four New Mexico pueblo tribes to hire private counsel because of a conflict of interest with the government.[2] In 1976, the Tenth Circuit upheld the Secretary's discretionary authority to expend funds for private counsel in

---

1. The Navajo Reservation Boundary Act of June 14, 1934, 48 Stat. 960, created boundaries and added land not previously part of the reservation. *See Sekaquaptewa v. MacDonald*, 448 F.Supp. 1183 (D.Ariz.1978), *aff'd in part and rev'd in part*, 619 F.2d 801 (9th Cir.1980), *cert. denied*, 449 U.S. 1010, 101 S.Ct. 565, 66 L.Ed.2d 468 (1980).

2. 25 U.S.C. § 2 provides "The Commissioner of Indian Affairs shall, under the direction of the Secretary of the Interior, and agreeably to such regulations as the President shall prescribe, have the management of all Indian affairs and of all matters arising out of Indian relations."

cases where the government could not represent a tribe due to a conflict of interest. *New Mexico v. Aamodt,* 537 F.2d 1102, 1107 (10th Cir.1976), *cert. denied,* 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 572 (1977). In 1983, the Department promulgated regulations requiring applications for discretionary reimbursement of private attorney fees from appropriated funds. 25 C.F.R. §§ 89.40–89.45. The regulations set forth a procedure for filing an application, factors to be considered in reviewing the request, and limitations on the availability of funds. *Id.*

Pursuant to the Settlement Act, the Department began reimbursing plaintiff for its legal fees and expenses in 1974. However, after 1983 the Department continued to award attorney fees to the Hopi Tribe under the Settlement Act without requiring it to comply with the new regulations. According to a careful review of the briefs, the review process for the years in question operated generally in the following manner. First, the Department would approve the contract between the tribe and its private counsel. At that time, the Secretary obviously cannot make a determination as to whether the fees actually charged would be related to the litigation or appropriate for reimbursement. That decision can only be made when the fees as billed are actually submitted for payment. After the contract was approved, the tribe would submit a request to the Department for the allocation of funds pursuant to § 640d–7(e).

The Office of Trust Responsibilities, attorney fee review committee, reviewed the request and made a recommendation to the Assistant Secretary. The Assistant Secretary, along with the Solicitor, approved the allocation which was then sent to the area office. As work was performed, the tribe would present invoices for legal fees and expenses to BIA. The BIA reviewed the invoices to ensure that the services provided were in accordance with the tribe's attorney contract, made adjustments based on improper charges, and approved the balance for payment.[3] In years where insufficient funds

were available to cover the entire request, a voucher form given to the tribe would note that no additional funds were available that year and approve payment from tribal funds. If additional money became available in a fiscal year, the voucher would be paid from those additional funds. The BIA also reimbursed the tribe if money became available in subsequent fiscal years upon receipt of proper documentation.

From 1986 to 1989, the BIA declined to authorize certain payments due to insufficient funds available. The BIA was concerned that it would be left without funds to pay for other tribes' attorney fees if it fully funded plaintiff's request. In 1989, a newly appointed Director of Office of Trust Responsibilities ("Director") decided that all requests from Indian tribes for reimbursement of attorneys' fees should be made according to the application procedure for discretionary funds under the 1983 regulations. 25 C.F.R. §§ 89.40–43. The Director analogized plaintiff's claims under the Settlement Act to requests from other tribes for attorneys' fees and stated that all requests should be treated equally.

Plaintiff refused to submit an application for fiscal year 1990, arguing that it was not required because § 640d–7(e) mandated payment of all appropriate expenses. The Director denied any payments of attorneys' fees under § 640d–7(e) for 1990 based on the tribe's failure to submit an application. After the tribe submitted an application, the Director denied payment because funds were no longer available. The tribe appealed the denial of its funds to the Interior Board of Indian Appeals ("IBIA" or "Board"). The IBIA held that the Director failed to adequately explain why § 640d–7(e) was discretionary, why the prior administrative practice of not requiring a formal application was incorrect, and that the Director did not apply his interpretation to all persons similarly situated. *Hopi Indian Tribe v. Director, Office of Trust & Economic Development,* IBIA 91–11–A, 22 IBIA 10 (1992) (*Hopi I*). The

---

**3.** It is not clear from the record who performed this review for the time period at issue. Defendant concedes that the during the various years, the review was performed by either the agency, the area office, Accounting Management, or some combination thereof. *See* Def.'s Cross–Motion for Summ. J. at 5, n. 5.

Board remanded to the Director to reconsider his 1990 decision.

In 1992, the Director again held that § 640d–7(e) was discretionary and that the Hopi Tribe was required to submit an application under the procedure set forth by the 1983 regulations. 25 C.F.R. §§ 89.40–89.43. The Board reversed this decision and remanded the case to the Director to determine the appropriate amount of attorney fees that would have been allocated to the tribe. *Hopi Tribe v. Director, Office of Trust Responsibilities*, IBIA 92–207–A, 24 IBIA 65 (1993) (*Hopi II*). The IBIA held that § 640d–7(e) was a congressional mandate to pay all appropriate legal fees. It also ruled that attorney fees requested under the Settlement Act are not subject to the 1983 regulations. The 1983 regulations apply when a tribe determines it is necessary to resort to litigation to protect its rights. 25 C.F.R. § 89.41. The Board held that it was Congress, not the tribes, that determined litigation was necessary to resolve the disputes over the 1934 reservation. In 1995, the tribe and the Department settled the 1990 fee claim. The tribe issued a formal demand letter the next year to the Secretary requesting payment of all outstanding fees. The parties ultimately agreed to a settlement for reimbursement of fees incurred for November 1990 to October 1995.

Subsequent to the commencement of the instant litigation, the Secretary, pursuant to 43 C.F.R. § 4.5 issued a notice that the Department was reviewing the IBIA's decisions holding that § 640d–7(e) was money-mandating.[4] 65 Fed.Reg. 39,420 (June 26, 2000). Whenever the Secretary decides to review a decision, "the parties and appropriate departmental personnel-which would include the board or administrative judge handling the case-will be notified, the administrative record will be requested, and a written decision will be issued." 50 Fed.Reg. 43,703 (October 29, 1985). In addition, the Secretary invited all interested parties, including the Hopi

Tribe, to submit briefs on the issue. On January 18, 2001, the Secretary released his decision that § 640d–7(e) was discretionary and ordering all future Settlement Act requests to be filed under the procedures set forth by the 1983 regulations.

**Proceedings in Court of Federal Claims**

Plaintiff's claim was filed in this Court on April 28, 1997 seeking reimbursement of all outstanding legal fees. The tribe asserts that it is due reimbursement for fees in the amount of $2,034,566.30 plus interest for the periods of January 1986 to October 1989 and November 1995 to November 1997. Pl.'s Mot. for Summ. J. 37. Plaintiff alleges that defendant erroneously subtracted certain items from its claims. Additionally, plaintiff contends that the Department improperly denied its pre–1990 claims as time-barred. The Department maintains that it correctly subtracted certain matters as either ineligible for reimbursement or unrelated to the 1934 litigation. The Secretary stated that plaintiff failed to provide proper documentation sufficient to establish that the items billed were related to the litigation. Defendant also continues to assert that the pre–1990 claims are untimely. The government initially moved to dismiss the tribe's suit for lack of jurisdiction because plaintiff had failed to exhaust its administrative remedies. The Court denied the government's motion to dismiss and suspended its proceedings pending a final decision by the Secretary regarding the appropriate sums for payment according to the statute. Order of Jan. 30, 1998 Den. Def.'s Mot. to Dismiss.

On July 16, 1999, the Secretary issued the final decision on the appropriate amount for payment ("July decision"). *See* Letter from Michael J. Anderson, Deputy Assistant Secretary–Indian Affairs to Wayne Taylor, Jr., Chairman, Hopi Tribal Council (July 16, 1999) (annexed to July 16, 1999 Def.'s Status Report). In that decision, the Department determined that $368,099.68 for fees incurred

---

4. 43 C.F.R. § 4.5 provides: "The authority reserved to the Secretary includes, but is not limited to: ... (2) The authority to review any decision of any employee or employees of the Department, including any administrative law judge or board of the Office [of Hearings and Appeals], or to direct any such employee or employees to reconsider a decision, except a decision by the Board of Contract Appeals which is subject to the Contract Disputes Act of 1978."

from November 1995 through November 1997 was appropriate for payment and deposited that amount with the tribe. *See* Sept. 3, 1999, Joint Status Report. The Department reached this conclusion after reviewing the tribe's billing statements, subtracting for fees previously reimbursed, and deducting expenses unrelated to the 1934 reservation litigation or inappropriate for reimbursement.

The July Decision also denied reimbursement of any fees incurred from 1986 to 1989 on the grounds that the tribe's claim was untimely. Analogizing to statutes of limitations for bringing suit against the government, such as 28 U.S.C. § 2501, the Secretary noted that more than six years had passed since this claim accrued against the Department. The Secretary explained that "[t]o pay the full amount of the old claims out of current appropriations would not be fair to other Tribes seeking payment." July Decision at 10. This is essentially the same reasoning that the Secretary relied upon in rejecting the tribe's original requests for those years. Subsequently, the parties stipulated to certain errors contained in the July Decision. The parties agree that the total amount eligible for reimbursement, as determined by the Secretary, for the pre–1990 fees is $1,798,620.94. This amount includes $1,698,437.77 for July 1986 to October 1989 and $100,183.57 for January 1986 to June 1986. *See* Stipulation by Plaintiff Hopi Tribe and Defendant United States Regarding Certain Factual Errors in the Government's Decision of July 16, 1999.

The matter is now before the Court on defendant's motion to dismiss for lack of subject matter jurisdiction and the parties' crossmotions for summary judgement. Defendant contends that this Court lacks jurisdiction because § 640d–7(e) is not money-mandating and does not create the fiduciary relationship needed to support a breach of trust claim.

## Discussion

### Motion to Dismiss

In considering a motion to dismiss, the court construes all allegations in favor of the non-moving party. *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The court must presume that the undisputed factual allegations included in the complaint are true. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed.Cir.1988). However, if the defendant challenges the truth of the jurisdictional facts alleged in the complaint, the plaintiff cannot rely merely on allegations in the complaint but must establish jurisdiction by a preponderance of the evidence. *Id.* The court "may consider relevant evidence in order to resolve the factual dispute." *Id.; see also Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1584 (Fed.Cir.1993) (when jurisdiction is at issue, the court is not limited to the pleadings); *Bergman v. United States*, 28 Fed.Cl. 580, 584 (1993). "The court should look beyond the pleadings and decide for itself those facts, even those in dispute, which are necessary for a determination of [the] jurisdictional merits." *Pride v. United States*, 40 Fed. Cl. 730, 732 (1998) (quoting *Farmers Grain v. United States*, 29 Fed.Cl. 684, 686 (1993)). The burden of establishing jurisdiction is on the plaintiff. *See Rocovich*, 933 F.2d at 993, *Reynolds*, 846 F.2d at 748.

### Subject Matter Jurisdiction

The jurisdiction of this Court is "prescribed by the metes and bounds of the United States' consent to be sued in its waiver of immunity." *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461 (Fed.Cir. 1998) (citing *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941)). A waiver of traditional sovereign immunity "cannot be implied but must be unequivocally expressed." *Saraco v. United States*, 61 F.3d 863, 864 (Fed.Cir.1995), *cert. denied*, 517 U.S. 1166, 116 S.Ct. 1565, 134 L.Ed.2d 665 (1996) (quoting *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969)).

■ Jurisdiction is present in this Court when a statute exists that "can be fairly interpreted as mandating compensation by the Federal Government for damage sustained." *United States v. Testan*, 424 U.S. 392, 400, 96 S.Ct. 948, 47 L.Ed.2d 114 (quoting *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1009, 178 Ct.Cl. 599, 607 (1967)). "If the language and effect of the statute is mandatory, then the court possesses jurisdic-

tion.... If, on the other hand, the language of the statute is permissive in scope and effect, the statute does not grant jurisdiction to hear the case." *Lewis v. United States,* 32 Fed.Cl. 59, 64 (1994).

When the plain language of the statute is discretionary, courts have held that the statute is not money-mandating. *Huston v. United States,* 956 F.2d 259, 262 (Fed.Cir. 1992) (holding the use of "may" in 5 U.S.C. § 5333(b) is not money-mandating); *Hoch v. United States,* 33 Fed.Cl. 39, 43 (1995) (finding that 28 U.S.C. § 524(c) was not money-mandating because Attorney General had discretionary authority to award payment); *Allen v. United States,* 229 Ct.Cl. 515, 518, 1981 WL 22043 (1981) (ruling that 21 U.S.C. § 886(a) "plainly places the payment of any sum entirely within the discretion of the Attorney General ...."). However, "the use of the word 'may' does not, by itself, render a statute wholly discretionary, and thus not money-mandating." *McBryde v. United States,* 299 F.3d 1357, 1362 (Fed.Cir.2002). Instead, the court "must proceed to test that presumption against the intent of Congress and other inferences that we may rationally draw from the structure and purpose of the statute at hand." *Id.* at 1362.

### 25 U.S.C. § 640d–7(e)

██ Plaintiff contends that § 640d–7(e) establishes a substantive right to compensation for all appropriate attorneys' fees incurred in connection with the 1934 reservation litigation. Defendant claims that the use of the words "authorized" and "any or all" in § 640d–7(e) means that the statute authorizes payment according to the agency's discretion and does not mandate payment. Defendant consistently argues that it must have complete discretion due to limited funds and competing requests from other tribes. Therefore, the issue for this Court to decide is whether the provision is sufficiently mon-

ey-mandating so as to provide a basis for jurisdiction under the Tucker Act.

When interpreting a statute, the Court must begin with the language of the statute itself. *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980). It is clear that nothing in the language of § 640d–7(e) itself creates a plainly prescribed duty that the Secretary authorize payment for the tribe's private counsel when the tribe is engaged in litigation under the statute. The provision, unlike § 640d–27(a), does not use the mandatory term "shall" in describing the Secretary's duty to provide payment. Rather, § 640d–7(e) merely states that the Secretary "is authorized" to reimburse the tribes for various types of legal fees. *Bennett v. Dep't of the Navy,* 699 F.2d 1140, 1146 (Fed. Cir.1983) ("we note that the statute, 5 U.S.C. § 7701(g), authorizes but does not direct the MSPB to require an agency to pay 'reasonable attorney fees.'"); *Allen,* 229 Ct.Cl. at 515 (holding that 21 U.S.C. § 886(a) which authorizes the Attorney General to make payments to informers is discretionary). The Court of Appeals for the Federal Circuit has noted that "when, within the same statute, Congress uses both 'shall' and 'may,' it is differentiating between mandatory and discretionary tasks." *Huston,* 956 F.2d at 262 (citing *Grav v. United States,* 886 F.2d 1305, 1307 (Fed.Cir.1989)). Thus, the plain language of the statute demonstrates that the Secretary's duty to compensate plaintiff under § 640d–7(e) is discretionary.[5]

However, the mere fact that a statute is discretionary does not end the matter. *See McBryde,* 299 F.3d at 1362. Instead, the court must examine whether the plain language is overcome by "legislative intent to the contrary or by obvious references from the structure and purpose of the statute ...." *Id.* (quoting *United States v. Rodgers,* 461 U.S. 677, 706, 103 S.Ct. 2132, 76 L.Ed.2d

---

5. The phrase "any or all" merely indicates that if the Secretary chooses to allocate funds, that he is authorized to pay for all costs. *Barseback Kraft AB v. United States,* 121 F.3d 1475, 1481 (Fed. Cir.1997) ("The word 'any' is generally used in the sense of 'all' or 'every' and its meaning is most comprehensive.") (citing *United States v. Rosenwasser,* 323 U.S. 360, 362–63, 65 S.Ct. 295, 89 L.Ed. 301 (1945)); WEBSTER'S II NEW COLLEGE

DICTIONARY (3d. ed.1986) (defining "any" as meaning "'one, no matter what one'; 'ALL'."). This court has held that the word "or" is "frequently used in its copulative, and not in its disjunctive sense, in which case the courts have not hesitated to construe it as meaning 'and.'" *H & B Am. Mach. Co. v. United States,* 81 Ct.Cl. 584, 595, 11 F.Supp. 48, 53 (1935).

236 (1983)). "Where the plain language of the statute would settle the question before the court, the legislative history is examined with hesitation to determine whether there is a clearly expressed legislative intention contrary to the statutory language." *Madison Galleries, Ltd. v. United States*, 870 F.2d 627, 629 (Fed.Cir.1989). Absent a clear cut legislative intent, the statutory language is ordinarily regarded as conclusive. *Burlington Northern R.R. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461, 107 S.Ct. 1855, 95 L.Ed.2d 404 (1987); *GTE Sylvania*, 447 U.S. at 108, 100 S.Ct. 2051.

In this case, there is nothing in the legislative history that clearly espouses an intent contrary to the discretionary language of section 640d–7(e). The "primary purpose of the 1934 Act was to consolidate land ownership within the boundaries of the Reservation." *Sekaquaptewa v. MacDonald*, 619 F.2d 801, 804 (9th Cir.1980), *cert. denied*, 449 U.S. 1010, 101 S.Ct. 565, 66 L.Ed.2d 468 (1980). As originally passed by the House of Representatives and as indicated by the Senate Committee, the Settlement Act provided for legislative partitioning of the land disputed in the 1934 reservation. H.R.Rep. No. 93–909, at 2 (1974); S.Rep. No. 93–1177, at 4 (1974); 120 Cong. Rec. 37,546 (1974). It was established that "physical partition of the surface of the lands in dispute was the best solution." H.R.Rep. No. 93–909, at 9. Congress understood that its plan to relocate large numbers of Indian families would be extremely costly.[6] By requiring the government to pay for most of the costs of relocating the displaced families, the House and Senate committees recognized that "the major costs of the resolution should properly be borne by the United States." H.R.Rep. No. 93–909 at 9; S.Rep. No. 93–1177, at 20.

Senator Montoya introduced a floor amendment authorizing litigation between the Navajo and Hopi tribes. 120 Cong. Rec. 37,731. In introducing his amendment, Senator Montoya's primary consideration was that a legislative solution was vulnerable to a Fifth Amendment challenge.[7] The debate on the Senate floor "centered around the concern of avoiding suits by the Navajo Nation for due process violations and the unconstitutional taking of its land without prior adjudication of its interest." *Masayesva v. Zah*, 792 F.Supp. 1165, 1168 (D.Ariz.1992); 120 Cong. Rec. 37,731–37,748. Senator Domenici argued that "[o]ur amendment will put it into the Courts to be resolved under standards set out by Congress." 120 Cong. Rec. 37,-734. Senator Jackson asked how Congress could "partition the land according to the rights and interests of the respective tribes when you do not have any firm ideas of what those rights and interests are?" *Id.*

The amendment was opposed by senators who argued that legislative partitioning would be an immediate and less costly solution. Senator Fannin stated his belief that "the desire of the committee and the desire of all Senators is to cut down on the expense and long years of litigation.... No more burdensome case can be imagined than relitigating the same kind of case as the 1882 area. That has cost both tribes millions of dollars." *Id.* at 37,734–5. Senator Goldwater argued that "[p]utting the ... issue into courts will delay a settlement of this issue for two decades, just as the 1882 joint use dispute has been delayed for 16 years." *Id.* at 37,733.

Senator Montoya introduced § 640d–7(e) as a separate amendment during the discussion. 120 Cong. Rec. 37,740. Because § 640d–7(e) originated as a floor amendment, no committee report discusses whether it is mandatory or discretionary. Senator Montoya's statements, as the sponsor of the bill enacted into law, are the only authoritative indications of congressional intent. *See North Haven Bd. of Educ. v. Bell*, 456 U.S.

---

**6.** "Any ultimate solution will involve severe economic, social, and cultural disruption." H.R.Rep. No. 93–909, at 9 (1974).

**7.** At the time he introduced the amendment, Senator Montoya stated: "It avoids a constitutional challenge to the bill. It prevents the relocation of over a thousand Indian families." 120 Cong. Rec. at 37,732; *Id.* at 37,728 (Sen.Abourezk) ("In my opinion, it is a violation of the fifth amendment rights of the Navajo people, the right not to have their property taken from them without due process of law.... Senator Montoya will offer an amendment to redress that particular grievance.").

512, 526–27, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982); *Schwegmann Bros. v. Calvert Distillers Corp.*, 341 U.S. 384, 394–95, 71 S.Ct. 745, 95 L.Ed. 1035 (1951) ("The fears and doubts of the opposition are no authoritative guide to the construction of legislation. It is the sponsors that we look to when the meaning of the statutory words is in doubt."). Statements by individual members of Congress "unless very precisely directed to the intended meaning of particular words in a statute, can seldom be expected to be as precise as the enacted language itself." *Regan v. Wald*, 468 U.S. 222, 237, 104 S.Ct. 3026, 82 L.Ed.2d 171 (1984); *Glaxo Operations UK, Ltd. v. Quigg*, 894 F.2d 392, 398 (Fed.Cir.1990).

At the time the amendment was offered, Senator Montoya did not make any remarks regarding the scope of the Secretary's duty to pay attorney fees. There was little direct discussion of its effect by any other senator except Senator Metcalf stating: "I believe that the attorney fees should be paid in the event that [Senator Montoya's] amendment is agreed to." 120 Cong. Rec. 37,740.; *Id.* at 40,265 ("Litigation expenses of the tribes are authorized to be borne by the United States."). These statements merely repeat the discretionary language of the statute. *See New England Tank Indus. v. United States*, 861 F.2d 685, 694 (Fed.Cir.1988) (holding that the regulation "employs mandatory terms such as 'will not' and 'will' rather than directory terms such as 'should.' "); *Cybertech Group v. United States*, 48 Fed.Cl. 638, 650 (2001) ("in everyday discourse, 'shall' is used to denote an affirmative command or obligation whereas 'should', by contrast, is used to denote a request or suggestion."). There is no indication that all Senators viewed the provision as mandatory. The legislative history reveals only that the amendment was offered as a compromise solution giving the Secretary authority to expend available funds. The individual statements cited by plaintiff fail to demonstrate that the amendment was intended as a congressional mandate.

Congress ultimately adopted § 640d, including the provision authorizing the Secretary to pay any or all appropriate legal fees. 120 Cong. Rec. 37,748. "Congress' adoption of a judicial settlement between the Navajo and Hopi Tribes, versus legislative allocation of land to the Hopi tribe, indicates a clear intention to avoid governmental liability for a taking of tribal land." *Masayesva*, 792 F.Supp. at 1168. Thus, the legislative history shows that Congress' main concern was to avoid an unconstitutional taking of the tribes' land. It was aware of the costs of litigation and gave the Secretary authority to expend available funds. There is no indication that Congress intended this provision as anything other than authorization for the Secretary, under certain circumstances, to award payment of attorney fees. When Congress intended to mandate payment, it clearly set out the requirements controlling the government's responsibilities toward the costs of relocation.

Several statements quoted by plaintiff were either included in Committee reports or made by individual members of Congress, both before Senator Montoya's amendments were introduced. The general statements about the historical underpinnings that gave rise to the Settlement Act are not directly pointed at the meaning of § 640d–7(e). *United States v. Meade*, 175 F.3d 215, 219 (1st Cir.1999) ("particularized explanations of how specific provisions of an act are meant to work have been deemed more instructive than generalized pronouncements about statutory purpose."). As such, they were not precisely directed to the meaning of § 640d–7(e). *See Glaxo*, 894 F.2d at 398. To allow such "clear statutory language to be materially altered by such colloquies, which often take place before the bill has achieved its final form, would open the door to the inadvertent, or perhaps even planned, undermining of the language actually voted on by Congress and signed into law by the President." *Regan*, 468 U.S. at 237, 104 S.Ct. 3026. Therefore, they do not provide clearly expressed intent contrary to the ordinary meaning of the statute.

Defendant points to the legislative history of the 1988 amendments, which made the San Juan Southern Paiute Tribe eligible for reimbursement, as additional support for its claim that payment is discretionary. The 1988 House Committee Report remarked:

The Committee notes that a substantial amount of funds have already been paid by the Secretary of the Interior to the Navajo and Hopi Tribes pursuant to section 8 of the Act. The Committee wants to emphasize that this subsection is not an entitlement and therefore, the Secretary is not obligated to pay any and all legal expenses incurred by the tribes under this section. It remains true however, that the Secretary can, in his discretion, and contingent on the availability of funds for this purpose, pay for all appropriate legal fees, court costs and other related expenses arising out of law suits brought under this section.

H.R. Rep. 100–1032, at 9 (1988).

An earlier Senate version of the bill capped federal reimbursement of attorney fees and directed the Secretary to pay all outstanding fees.[8] The House Committee Report attempts to provide meaning to language enacted by an earlier Congress. As plaintiff points out, "[i]t would seem a virtually impossible task for a single committee to determine with any reasonable degree of certainty the unstated intent of the entire Congress 13 years prior." *Nat'l Leased Hous. Ass'n v. United States*, 32 Fed.Cl. 454, 466 (1994); *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 650, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). However, although "subsequent congressional actions must be weighed with extreme care, they should not be rejected out of hand as a source that a court may not consider in the search for legislative intent." *Andrus v. Shell Oil Co.*, 446 U.S. 657, 666 n. 8, 100 S.Ct. 1932, 64 L.Ed.2d 593 (1980). The legislative history, even without reference to the 1988 House Committee Report, supports the conclusion that Congress intended to make payment

discretionary. It does not provide a clear congressional intent to mandate payment of attorneys' fees.

In support of jurisdiction, plaintiff cites two cases in which the Court of Appeals for the Federal Circuit has held that discretionary statutes were money-mandating. However, those cases are distinguishable for the reasons stated below. In *Doe v. United States*, 100 F.3d 1576 (Fed.Cir.1996), the Federal Circuit held that custom laws give the Secretary of the Treasury discretion to pay an informer an award of a sum of up to 25 percent of any amount recovered, but some sum must be awarded.[9] 100 F.3d at 1582. In analyzing the provision, the court noted the strong force of defendant's argument that the plain language was discretionary. However, the plain language was overcome by clear congressional intent to uphold prior judicial interpretation of an earlier version of the statute that mandated payment. *Id.* at 1582 (citing *Lindahl v. Office of Pers. Mgmt.*, 470 U.S. 768, 782–83, 105 S.Ct. 1620, 84 L.Ed.2d 674 (1985)) ("Congress's failure expressly to repeal prior judicial construction of review of disability determinations creates presumption that Congress intended to embody that construction in amended statute."). Unlike the moiety statute in *Doe*, the discretionary language of the Settlement Act is not defeated by such clear reliance on an earlier interpretation. The legislative history of the Settlement Act contains no reference to reliance on an earlier interpretation that Congress mandated payment of attorney fees to the Indian tribes.

The legislative history of the custom laws also shows that requiring some level of payment is in accord with congressional intent to encourage citizens to play an active role in combating drug trafficking. *Doe*, 100 F.3d at

---

**8.** S. 1236 (1988) proposed an amendment to 640d–27 to add "(e)(1) total amounts of funds that may be provided under 8(e) for each Indian Tribe for attorney services rendered after the date of enactment of the 1988 amendments shall not exceed $150,000 per fiscal year; (e)(2) subject to availability of appropriated funds, Secretary shall pay, as soon as possible, all attorney fees that are authorized to be paid under 8(e) for services rendered prior to such date. The Secretary shall submit to the Congress a written statement explaining why any claims for such attor-

ney fees have been rejected or not paid in timely manner."

**9.** 19 U.S.C. § 1916 provides that "[i]f any person who is not an employee or officer of the United States... (B) furnishes... original information concerning... (ii)violation of the customs laws... and (2) such... information leads to recovery of... (B) any fine, penalty, or forfeiture of property incurred; the Secretary may award and pay such person an amount that does not exceed 25% of the net amount so recovered."

1582. An informant would have no incentive to come forward with information if payment was entirely discretionary. Under those circumstances, a claimant was entitled to payment if specific statutory conditions were met. In this case, the purpose of § 640d–7(e) was to provide the Secretary with the authority to allocate funds to all of the tribes involved in the 1934 reservation litigation. The ability to consider the needs of all of the tribes does not in any way interfere with or defeat congressional intent to resolve the land dispute and give the tribes a process through which to apply for reimbursement of funds.

The authority granted to the Secretary under the Settlement Act is more closely aligned with that given to the Attorney General in deciding whether to grant an informer an award pursuant to the drug laws.[10] That statute, like the Settlement Act, is not money-mandating because Congress has merely authorized payment of an appropriate sum or sums. *Allen,* 229 Ct.Cl. at 518 (holding that payments under 21 U.S.C. § 886(a) is discretionary); *Nicolas v. United States,* 35 Fed. Cl. 387, 389 (1996) (holding that payments under 21 U.S.C. § 886(a) "are clearly discretionary."). Under 21 U.S.C. § 886(a), the Attorney General has the authority to pay any amount of money that he determines is appropriate. The Settlement Act provided similar authority to the Secretary when it authorized him to pay any or all fees that he determines are appropriate. Congress clearly intended that the Secretary have discretion to allocate available funds among the various tribes involved in the 1934 reservation litigation. Therefore, 640d–7(e) is not money-mandating because Congress has only authorized the Secretary to pay any sum that he determines is appropriate.

In *McBryde,* the Federal Circuit interpreted a statute stating that the Administrative Office of the United States Courts ("AO")

"may" provide representation to judges as actually mandating payment because a discretionary reading of the statute would have raised serious constitutional problems.[11] 299 F.3d at 1364. *St. Martin Lutheran Church v. South Dakota,* 451 U.S. 772, 780, 101 S.Ct. 2142, 68 L.Ed.2d 612 (1981) ("A statute . . . is to be construed, if such construction is fairly possible, to avoid raising doubts about its constitutionality."). If the AO were given complete discretion, it would have raised problems concerning separation of powers, independence of the judiciary, the First Amendment, and the relationship between the AO and the courts. Specifically, it "would allow a non-Article III entity too much sway over the judiciary." *Id.* at 1364. The court concluded that Congress could not have intended such a result that would threaten judicial independence. *Id.* In this case, no such constitutional issue is raised.

Moreover, in construing 28 U.S.C. § 463, the court determined that the purpose of the act, preserving the independence of the judiciary, could only be upheld if a judge was entitled to an attorney at government expense. Otherwise, judges would no longer be independent because the AO would have "the power to influence or coerce a federal judge in the performance of the judge's official duties." *Id.* (quoting *Tashima v. Admin. Office of the United States Courts,* 967 F.2d 1264, 1270 (9th Cir.1992)). In this case, the purpose of the Settlement Act would not be defeated if payment of the tribes attorneys' fees is held to be discretionary. The purpose of § 640d–7(e) was to allow the Secretary to distribute available funds to all of the eligible tribes. Having discretion to consider the amounts requested by other tribes involved in the 1934 reservation litigation would be entirely consistent with Congressional intent that all of the tribes have access to whatever funds are available at the times involved.

---

**10.** 21 U.S.C. § 886(a) provides "The Attorney General is authorized to pay any person, from funds appropriated for the Drug Enforcement Administration, for information concerning a violation of this subchapter, for such sum or sums of money as he may deem appropriate."

**11.** 28 U.S.C. § 463 provides "Whenever a Chief Justice, justice, judge, officer, or employee of any

United States court is sued in his official capacity, or is otherwise required to defend acts taken or omissions made in his official capacity, and the services of an attorney for the Government are not reasonably available . . . the Director of the Administrative Office of the United States Courts may pay the costs of his defense."

The plain language of the statute, the legislative history and the Department's own statutory interpretation support the conclusion that section 640d–7(e) is not money-mandating. Because the meaning of § 640d–7(e) is clear, there is no need to decide the issue of how much deference the Court must give the Department's current interpretation. *See Turtle Island Restoration Network v. Evans,* 284 F.3d 1282, 1297 (Fed.Cir.2002), *reh'g denied,* 299 F.3d 1373 (Fed.Cir.2002). Therefore, plaintiff's motion to strike the Secretary's January 18, 2001 decision is essentially moot, and is denied as such.[12] "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron,* 467 U.S. at 842–43, 104 S.Ct. 2778.

### Breach of Trust

█ Plaintiff's second claim is that the 1934 Act created a trust relationship between the United States and the tribe that imposed a fiduciary duty on the United States as trustee to preserve and protect the tribe's title to the 1934 Reservation. The tribe asserts that the government, as a result of this trust, has a duty to represent its interests in litigation concerning its right to such land. Furthermore, plaintiff argues that the Settlement Act serves as a substitute for the government's usual duties to represent it during litigation and imposes a specific fiduciary duty requiring the Secretary to reimburse all of the tribe's legal expenses.[13] If § 640d–7(e) imposes a fiduciary relationship between the United States and the Hopi Tribe then by implication it may be interpreted as mandating compensation for a breach of that fiduciary obligation.

The parameters of the United States' trust responsibilities to Indian tribes is set forth in two Supreme Court cases: *United States v. Mitchell,* 445 U.S. 535, 100 S.Ct. 1349, 63 L.Ed.2d 607 (1980) (*Mitchell I*) and *United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580 (1983) (*Mitchell II*). The Supreme Court confirmed that there is "an undisputed existence of a general trust relationship between the United States and the Indian people." *Mitchell II,* 463 U.S. at 225, 103 S.Ct. 2961. However, the fact that there is a general trust relationship does not mean that every claim "necessarily states a proper claim for breach of trust." *Pawnee v. United States,* 830 F.2d 187, 191 (Fed.Cir. 1987), *cert. denied,* 486 U.S. 1032, 108 S.Ct. 2014, 100 L.Ed.2d 602 (1988). Instead, the government's fiduciary obligations necessarily depend on the substantive laws creating those obligations. *Mitchell II,* 463 U.S. at 224, 103 S.Ct. 2961. In *Mitchell I,* the Court held that the General Allotment Act, 25 U.S.C. § 331, "created only a limited trust relationship between the United States and the allottee that does not impose any duty on the Government to manage tribal timber resources." 445 U.S. at 542, 100 S.Ct. 1349. On remand, the Court of Claims found that other statutes and regulations were sufficient to create a trust relationship necessary to seek money damages. Specifically, the court found that the statutes governing timber management, roadbuilding and right-of-way provisions; and trust fund management created a substantive right to money damages. *Mitchell v. United States,* 229 Ct.Cl. 1, 664 F.2d 265 (1981).

The Supreme Court agreed that "the statutes and regulations now before us clearly give the Federal Government full responsibility to manage Indian resources and land for the benefit of the Indians. They therefore establish a fiduciary relationship and define

---

12. The Court notes that the Secretary's decision was issued under regulatory authority and pursuant to notice and comment. The fact that the underlying litigation in this case may have been a factor in the Secretary's actions does not invalidate them. *See Barnhart v. Walton,* 535 U.S. 212, 122 S.Ct. 1265, 152 L.Ed.2d 330 (2002); *Smiley v. Citibank (S.D.), N.A.,* 517 U.S. 735, 741, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996) ("Nor does it matter that the regulation was prompted by litigation, including this very suit.")

13. In a previous order, this Court held that "Plaintiff's claim does not present a breach of trust situation as pleaded. Rather, if the IBIA's decision is correct, Congress has enacted a statute which directly creates an entitlement to certain monetary relief." Order of Jan. 30, 1998 Den. Def's Mot. to Dismiss. Plaintiff asserts that "Given the Decision issued on July 16, 1999, the Tribe's complaint now states a breach of trust claim, *as well as* a breach of the specific statutory obligation to pay money." Pl.'s Mot. for Summ. J. at 15, n. 5.

the contours of the United States' fiduciary responsibilities." *Mitchell II*, 463 U.S. at 224, 103 S.Ct. 2961. The Court concluded that the government exercised "literally daily supervision over the harvesting and management of tribal timber." *Id.* at 222, 103 S.Ct. 2961. Moreover, "[w]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." *Mitchell II*, 463 U.S. at 225, 103 S.Ct. 2961 (quoting *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980)). The Court concluded that the government had fiduciary responsibilities because it exercised "literally daily supervision over the harvesting and management of tribal timber." *Mitchell II*, 463 U.S. at 224, 103 S.Ct. 2961.

These cases demonstrate that there is a distinction between statutes creating an Indian reservation that give rise to a limited trust relationship and laws that create a full fiduciary duty toward an Indian tribe. The Federal Circuit has explained that the "difference lies in the level of control the United States exercises in its management of the land and its resources for the benefit of the Indians. Where the United States controls the resources, the duty is that of a fiduciary; when the Indians control their owns resources, the duty of the United States is lessened appropriately." *Navajo Nation v. United States*, 263 F.3d 1325 (Fed.Cir.2001), *cert. granted*, 535 U.S. 1111, 122 S.Ct. 2326, 153 L.Ed.2d 158 (2002). The Federal Circuit has found that a number of statutory schemes establish the necessary control to give rise to a full fiduciary relationship. *See Confederated Tribes of the Warm Springs Reservation v. United States*, 248 F.3d 1365, 1370 (Fed.Cir.2001) (finding that "United States exercises comprehensive control over the management and harvesting of timber on Indian reservations."); *Brown v. United States*, 86 F.3d 1554 (Fed.Cir.1996) (deciding that control over commercial leasing of allotted lands was sufficient to impose fiduciary duty); *Pawnee*, 830 F.2d at 187 (holding that comprehensive scheme and the government's elaborate control over leasing of oil and gas resources created trust).

In this case, plaintiff seeks to impose a specific fiduciary duty to pay its attorneys' fees based on the statutory framework set forth in the Settlement Act. In *Fort Mojave Indian Tribe v. United States*, 23 Cl.Ct. 417 (1991), Indian tribes argued that the government had breached its fiduciary duty by providing inadequate representation in litigation concerning its water rights. The court found that the statute and executive orders creating the tribes' reservations were sufficient to create an arrangement where the United States held in trust for the tribes legal title to both reservation land and any corresponding vested water rights. The court held that the executive orders creating the tribes' reservation, the statute authorizing the government to represent the tribes in litigation to preserve the tribes' interests,[14] combined with the government's representation of the tribes was sufficient to invoke the necessary control over tribal property giving rise to full fiduciary obligations.

Following *Mitchell II*, the court found that the government exercised elaborate control over the tribes' water rights when it "chose to exercise control over plaintiffs' defense of their water rights." *Id.* at 427. The government's fiduciary duty to protect the tribes' water rights "would necessarily include prudently representing plaintiffs' interests in litigation where ownership to those water rights is placed in issue." *Id.* at 426. In this case, the government did not exercise elaborate control over the land belonging to the Hopi Tribe because it did not control the presentation of the tribe's interests in the

---

14. 25 U.S.C. § 175 provides that "In all States and Territories where there are reservations... the United States attorney shall represent them in all suits at law and equity." Courts have found that this "imposes only a discretionary duty of representation." *Pyramid Lake Paiute Tribe of Indians v. Morton*, 499 F.2d 1095, 1097 (D.C.Cir.1974), *cert. denied*, 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975); *Rincon Band of Mission Indians v. Escondido Mut. Water Co.*, 459 F.2d 1082 (9th Cir.1972).

1934 reservation litigation. Instead, the tribe controlled the defense of its rights by bringing suit on its own. *Fort Mojave* merely confirms that where the United States assumes the obligation to defend an Indian tribe in litigation and, when it does so under the authority of 25 U.S.C. § 175, that it acts as a fiduciary for that tribe. *See Pyramid Lake Paiute Tribe of Indians v. Morton,* 499 F.2d 1095, 1097 (D.C.Cir.1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975); *Canadian St. Regis Band of Mohawk Indians v. NY,* 205 F.R.D. 88 (N.D.N.Y.2002) ("it is one thing to say the government should be held accountable for damages it makes when it assumes the role of the fiduciary, quite another to say that an Indian tribe may compel the government to take steps it deems unwise."). As the court admitted, "plaintiffs do not fault defendant for refusing to represent plaintiffs' interests … but rather for choosing to represent their interests and then doing so inadequately." *Fort Mojave,* 23 Cl.Ct. at 426–427.

Where there is a conflict of interest, the United States may decline representation. *See Karuk Tribe of Cal. v. United States,* 28 Fed.Cl. 694, 698 (1993); *Wichita & Affiliated Tribes v. Hodel,* 788 F.2d 765, 775 (D.C.Cir. 1986) ("whatever allegiance the government owes to the tribes as trustee, is necessarily split among the three competing tribes involved in this case."); *Manygoats v. Kleppe,* 558 F.2d 556, 558 (10th Cir.1977); *Rincon Band of Mission Indians v. Escondido Mut. Water Co.,* 459 F.2d 1082 (9th Cir.1972). In addition, the government does not have to file suit when it determines that a tribe's claim has no merit. *Shoshone–Bannock Tribes v. Reno,* 56 F.3d 1476, 1481–82 (D.C.Cir.1995) (holding that neither 25 U.S.C. § 175 nor the government's fiduciary relationship required the Attorney General to file suit on behalf of the tribe.). The Secretary then has discretion to provide funds to pay for the tribe's private legal expenses. *Aamodt,* 537 F.2d at 1107.

Even assuming that the government had a duty to represent the tribe in the 1934 reservation litigation, it does not mean that the Settlement Act established a fiduciary obligation to pay for the tribe's legal expenses.

The *Fort Mojave* court did not deal with the fiduciary responsibilities of the United States to provide payment where it does not represent a tribe due to a conflict of interest. Courts have held that the Secretary's obligation under 25 U.S.C. § 175 to provide funds for private counsel is merely discretionary. *Aamodt,* 537 F.2d at 1107; *Pyramid Lake,* 499 F.2d at 1096–97 (holding that 25 U.S.C. §§ 175, 476 do not impose a fiduciary duty to award attorney fees.); *United States v. Gila River Pima–Maricopa Indian Cmty.,* 391 F.2d 53, 56–57 (9th Cir.1968). Therefore, plaintiff's argument hinges on whether § 640d–7(e) establishes an additional fiduciary duty to pay for the tribe's legal fees and expenses arising out of the 1934 reservation litigation.

Plaintiff argues that "like the statutes at issue in *Mitchell,* the Settlement Act 'clearly establish[es] fiduciary obligations of the Government' and a foundation for the Tribe's breach of trust claim against the United States." Pl.s' Mot. for Summ. J. at 15 (quoting *Mitchell II,* 463 U.S. at 226, 103 S.Ct. 2961). Specifically, plaintiff argues that the Settlement Act imposes a fiduciary duty to bear the financial burden of the costs of litigation. However, the government's fiduciary obligations necessarily depend on the substantive laws creating those obligations. Plaintiff relies heavily on statements contained in the legislative history which it argues shows that Congress enacted the Settlement Act because of its failure to carry out its moral and legal responsibilities. However, the fact that Congress took responsibility for the land dispute does not mean that the Settlement Act created a fiduciary duty.

In *Begay v. United States,* 16 Cl.Ct. 107, 124 (1987), *aff'd,* 865 F.2d 230 (Fed.Cir.1988), the Court of Federal Claims held that the Settlement Act did not create a trust relationship that imposed a fiduciary duty on the relocation commission. In *Begay,* the plaintiffs argued that Congress created a fiduciary obligation when it took corrective action to solve the land dispute. After reviewing the legislative history, the court concluded that "taking action to solve a problem can hardly be equated with the creation of a trust." *Begay,* 16 Cl.Ct. at 128. Despite statements

that Congress passed the Act to remedy an injustice, it "never intended to create a fiduciary relationship between the Commission and individual Indians." *Id.* at 127. Instead, the Act demonstrated that "Congress was aware of the stress of relocation and wished to soften its impact if possible." *Id.*

In this case, similar reasoning leads to the conclusion that Congress did not seek to impose a fiduciary obligation to pay for the tribe's litigation fees. Congress sought to allow the Indian tribes to resolve the dispute on their own instead of subjecting the tribes to an unconstitutional taking of their land. It was clearly aware of the potential conflict of interest which prevented the Attorney General from representing both sides in any litigation. Because the government could not represent all the tribes, it authorized the tribes to bring suit on their own and intended for the tribes to hire private counsel. It is also clear from the statute that Congress was aware of the costs of litigation and granted the Secretary the authority, in his discretion, to provide assistance. This does not by itself create a trust relationship. There is nothing in the 1934 Act creating the reservation nor the Settlement Act which indicates that Congress intended the government to control any tribal resource. Plaintiff's reliance on *Cherokee Nation of Oklahoma v. United States,* 124 F.3d 1413 (Fed. Cir.1997) is misplaced because that case involved the government's fiduciary duty to manage tribal land for the exploitation of natural gas, oil, and solid mineral rights. Plaintiff concedes that its claim is not based on the government's duty to manage, restore, or maximize profit on its land.

Plaintiff has failed to demonstrate that either the Settlement Act as a whole, or § 640d–7(e) specifically, is sufficient to create a fiduciary relationship. *Mitchell II,* 463 U.S. at 224–25, 103 S.Ct. 2961. This court has previously held that "Congress, unlike the situation in *Mitchell II,* did not, in the [Settlement] Act give the Commission pervasive control over, and complete supervision and management of plaintiff's property and lives." *Begay,* 16 Cl.Ct. at 124. The relationship created by § 640d–7(e) is not comparable in purpose or degree to the control

or supervision of tribal monies or properties that has been found to establish a complete fiduciary duty. Nor is the system of paying private attorneys' fees in § 640d–7(e) as comprehensive or detailed as the timber management statutes. It can hardly be said that Congress intended to give the Secretary control over plaintiff's land rights. The Secretary in no way exercised any control over plaintiff's defense of its rights. The Secretary's role is limited to reviewing bills submitted for work previously performed in order to determine whether they are appropriate for reimbursement from available funds. This does not represent congressional intent to impose fiduciary obligations.

### Reimbursement of Legal Fees

Even if, for the purpose of argument, it were assumed that jurisdiction is present to render judgment on plaintiff's claims, entitlement is not established to recover all of the fees that the Secretary declined to pay upon his determination that they were either inappropriate or unrelated to the 1934 reservation litigation. Assuming jurisdiction to be present, the tribe would be entitled to a judgment covering the pre–1990 fees that the Secretary declined to pay as time barred.

### Pre–1990 Fees

This Court has jurisdiction to hear claims against the government if suit is brought within six years after the claim first accrues. 25 U.S.C. § 2501. The statute of limitations is a "jurisdictional requirement provided by Congress that must be strictly construed." *Bowen v. United States,* 292 F.3d 1383, 1385 (Fed.Cir.2002). A claim against the government accrues when "all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action." *Hopland Band of Pomo Indians v. United States,* 855 F.2d 1573, 1577 (Fed. Cir.1988); *Chandler v. United States,* 47 Fed.Cl. 106, 113 (2000).

Defendant argues that if jurisdiction were present, plaintiff could have filed suit as soon as it submitted its bills for reimbursement and failed to receive full payment. The government contends that plaintiff's pre–1990 claims are barred because they were not filed until 1997. Plaintiff submits that its cause of action did not accrue until the Secretary's

final appropriateness decision was issued on July 19, 1999. The tribe points out that § 640d–7(e) requires the Secretary to make such a decision and therefore all the events necessary to fix the government's liability had not occurred until that point.

"If disputes are subject to mandatory administrative proceedings, then the claim does not accrue until their conclusion." *Lins v. United States*, 231 Ct.Cl. 579, 688 F.2d 784, 787 (Ct.Cl.1982) *cert. denied*, 459 U.S. 1147, 103 S.Ct. 788, 74 L.Ed.2d 995 (1983). In cases where "the cause of action does not accrue until after a determination entrusted by Congress to an administrative official . . . the claim does not accrue until after the executive body has acted (if seasonably asked) or declines to act." *Friedman v. United States*, 159 Ct.Cl. 1, 16, 310 F.2d 381, 386 (1962). The general rule is that "in appropriate cases conditions precedent to the accrual of a cause of action can be established by statute, contract, or common law, and that where such a condition precedent has been created the claim does not ripen until that condition has fulfilled." *Id.*

Where a statute provides that a claim would be paid only upon a determination by a designated agency official, the statute of limitations does not begin to run until after the determination has been made. *See Utah Power & Light Co., v. United States*, 67 Ct.Cl. 602, 607, 1929 WL 2605 (1929) (holding that under Act of March 4, 1907, 34 Stat. 1270,[15] the statute of limitations did not begin to run until after the Secretary of Agriculture denied a claimant's request for refund); *Harrison v. United States*, 20 Ct.Cl. 175, 1800 WL 1323 (1885) (concluding that statute required demand and refusal by Secretary of Treasury before claim begins to accrue).

Under the Settlement Act, Congress has charged the Secretary with making a determination whether plaintiff is entitled to reimbursement and as to the amount due. Plaintiff's entitlement to reimbursement of attorneys' fees after submission of invoices could not mature until there was a final determination of appropriateness by the Secre-

tary. There is no statute of limitations imposed by the Settlement Act regarding the submission of fees. *Utah Power*, 67 Ct.Cl. at 607 ("the plaintiff had a right to apply to the Secretary of Agriculture for a refund of excess payment at any time after payment. There is no limitation fixed therein as to the time of such application."). Again, assuming that jurisdiction were present to resolve plaintiff's claims, the Secretary's determination would be a condition precedent to the accrual of plaintiff's cause of action. As such, the Settlement Act claims fit within the line of cases where conditions precedent to the accrual of a cause of action have been established by statute. Therefore, the statute of limitations would not begin to run until after the Secretary's final appropriateness determination. Assuming jurisdiction, once the Secretary makes a final appropriateness decision, an Indian tribe could then bring an action for money judgment in the Court of Federal Claims, seeking any fees for which payment was denied.

When plaintiff initially filed its claim, the Secretary had not made a determination regarding the appropriate sums to be paid according to the statute. As a result, plaintiff's claim was not ripe for decision. *See* Jan. 30, 1998 Order. Under the doctrine of exhaustion of administrative remedies, "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 82 L.Ed. 638 (1938). However, the court "must be sensitive to the constitutional and prudential concerns reflected in the ripeness doctrine, while at the same time being aware that purposeful bureaucratic delay and obfuscation is not a valid basis for denial of judicial relief." *Bayou Des Familles Dev. Corp. v. United States*, 130 F.3d 1034, 1038 (Fed.Cir.1997). Following this doctrine, this Court suspended the case to allow the Secretary to make a final decision as required by the statute. *See Lewis v. United States*, 32 Fed.Cl. 59, 65–66 (1994) (maintaining juris-

**15.** The Act of March 4, 1907 provides "there is hereby appropriated and made available, as the Secretary of Agriculture may direct, out of funds in the treasury not otherwise appropriated, so much as may be necessary to make refunds."

diction despite failure to exhaust administrative remedies so that agency could make final decision). The Department's inability to pay due to insufficient funds was not a determination by the Secretary regarding the appropriateness of those fees. In fact, plaintiff has previously been allowed to resubmit fees in years where there has been insufficient funding. By Order dated January 30, 1998, it was held that the Director's April 18, 1997 letter addressing plaintiff's claims did not constitute a final decision. Instead, the letter indicated that the Secretary sought additional information and contemplated a further response on the matter. The Secretary's decision on the appropriate amount for repayment was not made until July 19, 1999. Therefore, plaintiff's claim would not be barred by the statute of limitations, were jurisdiction present to resolve it.

Review of the Secretary's decision to deny funds is conducted under the arbitrary and capricious standard of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, et seq.; *Bowen v. Massachusetts*, 487 U.S. 879, 895–900, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988) (holding that claim for specific relief, although monetary, was not a claim for money damages). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgement for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). It is also confined to the administrative record. *Camp v. Pitts*, 411 U.S. 138, 142, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). An agency decision would be arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43, 103 S.Ct. 2856.

The Department declined to pay all of plaintiff's pre–1990 requests based on the need to provide money to other tribes. The record demonstrates that the Secretary did not deny payment because he determined that the fees were either inappropriate or unrelated to the litigation. Rather, the Secretary concluded that the "fees and expenses are too old to be reimbursable, however.... To pay the full amount of the old claims out of current appropriations would not be fair to other Tribes seeking payment.... Just as the Hopi Tribe is asking for fair treatment of its request for fees, so are the other tribes". July Decision at 10.

If § 640d–7(e) were money-mandating, then the Secretary's decision considered factors that went beyond those laid out by Congress. If § 640d–7(e) mandated payment, Congress would not intend for the Secretary to consider requests by other tribes for attorney fees under 25 U.S.C. § 175 in deciding on the appropriate amount to pay. Also, there is no provision for the Secretary to make any judgment regarding whether the claim was too old to be submitted. Rather, if payment is mandated, discretion is limited to determining whether any of the fees charged are excessive or unrelated to the 1934 reservation litigation. If the Secretary determines that the charges do not fall in either of these categories, then payment would be mandated.

Defendant argues that in any event, the Secretary's disbursement of funds would be discretionary because Congress appropriates a lump-sum to the Department for attorney fees. The Supreme Court has held that:

a fundamental principle of appropriations law is that where Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions, and indicia in committee reports and other legislative history as to how the funds should or are expected to be spent do not establish any legal requirements on the agency.

*Lincoln v. Vigil*, 508 U.S. 182, 192, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993) (quoting *LTV Aerospace Corp.*, 55 Comp.Gen. 307, 319 (1975)).

In *Lincoln*, the Court held that the Snyder Act, 25 U.S.C. § 13, did not mandate that the Department expend its general appropria-

tions on a particular program for a specific class of Indians. 508 U.S. at 195, 113 S.Ct. 2024; *See White Mt. Apache Tribe v. United States,* 249 F.3d 1364, 1372 (Fed.Cir.2001) (holding that Snyder Act does not give rise to a money-mandating claim). If the Settlement Act were a mandate to pay compensation, then it statutorily restricts the Secretary's discretion. Congress has limited the Secretary's discretion to withhold funds to situations where the charges are inappropriate or unrelated to the 1934 reservation litigation. These restrictions not being present, were § 640d–7(e) money-mandating, plaintiff would be entitled to recover $1,798,620.94 for pre–1990 fees.

## The Secretary's Discretionary Authority

Under the statute, there are two situations where the Secretary can deny a tribe's request for reimbursement. The Secretary, pursuant to statutory authority, has discretion to deny reimbursement for charges submitted that are inappropriate. He must also deny payment if he determines that a particular expense claimed is not "arising out of, or in connection with" the 1934 reservation litigation. The Secretary must review the invoices submitted to determine whether any of the fees are inappropriate or unrelated to the underlying litigation. If such a determination is made, then the tribe shall not be reimbursed for those charges.

## Appropriate Amount of Fees, Expenses, and Costs Award

Section 640d–7(e) states that the tribe may be reimbursed for three types of charges: 1) legal fees; 2) court costs; and 3) other related expenses. As discussed earlier, the plain language of the statute shows that Congress intended the Secretary to exercise discretion in determining which charges were appropriate for payment. For example, after reviewing the invoices he may determine that private counsel charged an excessive fee or spent an unreasonable amount of time on the claim. *Tashima,* 967 F.2d at 1264 ("it is not reasonable to conclude that Congress intended to require the AO to pay all costs or time charges regardless of how excessive they

might be."). Judicial review of the Secretary's factual determination regarding the appropriateness of fees is conducted under the abuse of discretion standard.

The Secretary hired Legalgard Information Systems ("Legalgard") to conduct a review of the tribe's billing statements from July 1986 through October 1989 and November 1995 to November 1997. July Decision at 2. In February 1999, Legalgard's initial report identified several categories of fees and expenses, seven of which were adopted by the Secretary, that should be denied reimbursement. *See* Def.'s Resp. to Mot. to Lift Stay, Ex. B at 7. Legalgard's report stated that the firm billed for professionals who performed administrative, secretarial, and clerical "activities includ[ing] filing and refiling documents, sending documents by Federal Express and/or telecopier and picking up or delivering documents." *Id.* The review also recommended that "the cost of conferences which are administrative, supervisory or status-related are overhead costs and non-billable. Quality control and assigning work are administrative costs of running the business of a law firm." *Id.* Legalgard concluded that certain expenses, such as office supplies, should not be recovered because they were overhead costs.

In May 1999, Legalgard conducted a further review of the tribe's invoices. This second review, apparently of the same billing statements, raised more specific concerns regarding the appropriateness of the fees. For example, the review alleged that firm had charged for "attorneys performing paralegal tasks such as drafting deposition digests, summarizing records, interviewing witnesses, and handling simple written discovery." *Id.* at 3. Legalgard also recommended reduction because "the firm billed the client for the cost to perform administrative functions, such as preparing an invoice or assigning work, and for quality control, both of which should be overhead costs to the firm." *Id.*

In this case, the Secretary determined that $90,824.55 in fees and expenses charged were inappropriate for payment.[16] The Sec-

---

**16.** This total consisted of $74,165.03 charges incurred from July 1986 to October 1989;

$9,883.17 for November 1995 to November 1997. The Secretary also deducted $6,776.35 for

retary denied payment of the following legal fees as non-billable: 1) professionals performing secretarial/clerical functions; 2) administrative, supervisory, or status-related intra-office conferences; 3) administrative/coordination activities; and 4) proofreading (quality control). July Decision at 4–5. Expenses were denied for legal assistant services for offsite storage of archived documents, office supplies, and facsimile/telecopier charges. *Id.* The tribe's claims for these fees and expenses were denied because they "are generally part of a law firm's costs of doing business (overhead) and are traditionally included in an attorney's hourly rates." *Id.* at 4. The Secretary held that "there is no provision under § 640d–7(e) for the Department to pay anything other than the firm's contracted, standard rates." *Id.* The Secretary noted that the tribe's contract prohibited reimbursement for general overhead expenses and that the firm's hourly rates already included a $5.00 per hour surcharge for secretarial services. *Id.* Defendant does not contest the accuracy of these fees and expenses, but instead argues that they should be viewed as overhead encompassed within an attorney's hourly fee rather than as billed separately to clients. Plaintiff argues that the Secretary has failed to provide a reasoned explanation why these charges constitute non-reimbursable overhead.

"The initial estimate of a reasonable attorney's fee is properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonably hourly rate." *Blum v. Stenson,* 465 U.S. 886, 895–896, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). The hourly rate is normally determined by the attorney's "skill, reputation, status, experience, prevailing rates for comparable legal services in the community, firm overhead, etc." *Bennett,* 699 F.2d at 1145, n. 6.[17] Under the Back Pay Act, 5 U.S.C. § 5596, the Federal Circuit has interpreted the term "reasonable attorney fees" to include those

out-of-pocket expenses that "are directly related to the services performed by the attorney, are not charges that are normally subsumed within the hourly rate figure, and yet may fairly be described as part of the fee for services rendered." *Bennett,* 699 F.2d at 1146. On the other hand, "[p]hotocopying, deposition costs, witness fees, and other expenses are 'taxable costs' or 'expenses' not to be considered part of an award of attorney fees." *Gavette v. Office of Pers. Mgmt.,* 808 F.2d 1456, 1462, n. 29 (Fed.Cir.1986).

"If a task can easily be performed by a higher paid and a lower paid employee, the court thinks it unreasonable to choose the former. Moreover, the Supreme Court specifically has distinguished purely clerical or secretarial tasks, holding those 'tasks should not be billed at a paralegal rate, regardless of who performs them.'" *Hines v. Sec'y of Dep't of Health & Human Servs.,* 22 Cl.Ct. 750, 756 (1991) (quoting *Missouri v. Jenkins,* 491 U.S. 274, 288, n. 10, 109 S.Ct. 2463, 105 L.Ed.2d 229. (1989)); *Johnson v. Georgia Highway Express, Inc.* 488 F.2d 714, 717 (5th Cir.1974) ("It is appropriate to distinguish between legal work, in the strict sense, and investigation, clerical work, compilation of facts and statistics and other work which can often be accomplished by non-lawyers . . . ."); *In re Meese,* 907 F.2d 1192, 1203 (D.C.Cir.1990) ("The court therefore deducts those charges by both paralegals and law clerks for such tasks as 'delivering' or 'picking up' various documents as well as photocopying. In our view, such tasks are 'purely clerical or secretarial' and thus cannot be billed at paralegal or law clerk rates.").

This court has also held that "clerical services, such as proofreading, assembling, photocopying and mailing exhibits and pleadings, should be performed by lower paid staff and not by partners. Furthermore, the cost of these services are more appropriately charged to overhead, and as such, are included within the . . . hourly rate." *Batdorf v. Sec'y of Dep't of Health & Human Servs.,* 1990 WL 293394 * 2 (Cl.Ct.). It was well

---

January 1986 to January 1989 without explaining exactly which fees and expenses were considered overhead.

17. Plaintiff's attorney contract, which was approved by the Department, set out the hourly rate and is not contested in this matter.

within the Secretary's discretion to reduce payment for those hours billed, in his experience and judgment, that were secretarial, clerical, or administrative in nature.

Plaintiff also contests the Secretary's denial of certain expenses as overhead. The "term 'expenses' is generally understood to include all the expenditures made by a litigant in connection with an action." *Bennett,* 699 F.2d at 1143. Under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412, the Federal Circuit has rejected the claim that parties could not recoup expenses for photocopying, printing and binding of briefs, telephone, postal, and overnight delivery services.[18] *Oliveira v. United States,* 827 F.2d 735, 743–44 (Fed.Cir.1987) (citing *Int'l Woodworkers of Am. v. Donovan,* 792 F.2d 762, 767 (9th Cir.1985)). Under the EAJA, this court has awarded administrative expenses and costs such as the "recovery of copying, delivery services, travel, research services, telephone, and postage costs, as well as other expenses routinely incurred by attorneys, assuming they are documented and reasonably necessary to prosecution of the claim." *R.C. Constr. Co., v. United States,* 42 Fed.Cl. 57, 63–64 (1998) (citing *Prowest Diversified, Inc. v. United States,* 40 Fed.Cl. 879, 888 (1998)) (awarding copying, facsimile, messenger services, research services, and office services expenses); *KMS Fusion v. United States,* 39 Fed.Cl. 593, 605–606 (1997) (awarding expenses for copying, delivery services, and local travel); *PCI/RCI v. United States,* 37 Fed.Cl. 785, 791 (1997) (granting an application for computer research services, photocopying, postage, telephone, and travel expenses). Therefore, the Secretary's denial of $1,548.50 for "Facsimile/Telecopier Charges" solely on the basis that it is unrecoverable overhead was an abuse of discretion because

§ 640d–7(e) allows for reimbursement of reasonable expenses.

In this case, the Secretary did award payment for certain expenses that it considered overhead since "the Tribe agreed in its contract with Arnold & Porter to pay those particular expenses, the Department will not deduct those amounts from the Tribe's claim."[19] July Decision at 4. Indeed, it would be arbitrary for the Secretary to deny these reasonable out-of-pocket expenses in plaintiff's attorney contract when § 640d–7(e) explicitly provides for payment of related expenses. Reasonable out-of-pocket expenses billed separately to the client, such as the ones listed in plaintiff's attorney contract, are distinguishable from non-recoverable overhead costs which must be subsumed within the hourly rate.

However, certain expenses may not be recoverable because they are already included within an attorney's hourly rate. "Examples of expenses that would be covered by the hourly rate include fixed overhead such as utilities, rent, and secretarial expense." *Bennett,* 699 F.2d at 1145, n. 5; *Greene v. Sec'y of Dep't of Health & Human Servs.,* 19 Cl.Ct. 57, 68 (holding that "secretarial services is one such overhead, and, therefore, is not compensable separately."). The Secretary's reduction of expenses for office supplies and storage was reasonable because these are routinely denied as overhead. *Bennett,* 699 F.2d at 1145, n. 5; *Gonzales v. Sec'y of Dep't of Health & Human Servs.,* 1992 WL 92200 * 4 ("The cost of supplies should be encompassed in the attorney's fee. This is a basic element of operational costs."). The Settlement Act also provides for the reimbursement of certain routine court costs.[20] In this case, the record demon-

---

**18.** 28 U.S.C. § 2412(d)(1)(A) provides "a court shall award to a prevailing party other than the United States fees and other expenses, in addition to costs awarded pursuant to subsection (a), incurred by that party . . . ."

**19.** The Tribe's contract stated that "Attorneys shall be reimbursed for any and all reasonable expenses, . . . including, but not limited to, the following: (a) Travel expenses by rented vehicle, reimbursed on the basis of actual expenses incurred; . . . (e) reasonable long distance telephone, telex, telecopy, and telegraph charges; (f)

taxi fares; (g) mailing expenses; (h) costs of printing or reproducing documents, briefs, and other materials; (i) reasonable lodging and meal expenses incurred with respect to Tribal business; (j) costs of secretarial services as set forth in Schedule I . . . (k) fees and expenses paid by Attorneys, with Tribal council authorization, to expert witnesses and local counsel." Pl.'s Mot. for Summ. J., Ex. D.

**20.** Taxable court costs are set forth in 28 U.S.C. § 1920, which provides: "A judge or clerk of any court of the United States may tax as costs the

strates that the payment of any court costs is not challenged.

**Arising Out of, or in Connection with**

Section 640d–7(e) clearly states that the Secretary is only authorized to pay for fees, costs, and expenses "arising out of, or in connection with" the 1934 reservation litigation. The Secretary must review the invoices submitted to determine that they are connected to or arise out of a claim brought under the statute. As the *Tashima* court held, "such a determination cannot be made when private counsel is first requested; the AO must wait for the actual fees to be submitted." 967 F.2d at 1273. Application of principles of law to facts are mixed questions of law and fact. *Id.* at 1274 (citing *United States v. McConney*, 728 F.2d 1195, 1201 (9th Cir.1984) (en banc), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984)). Thus, judicial review of the Secretary's conclusion that the record was insufficient to determine whether the fees are unrelated is a mixed question of law and fact that is conducted de novo. *See Udis v. United States*, 7 Cl.Ct. 379, 383 (1985).

The Settlement Act does not expressly define the phrase "arising out of, or in connection with." Courts should interpret undefined terms using their ordinary meaning. *See Bailey v. United States*, 516 U.S. 137, 144, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). In an insurance policy, other circuits have held that the words "arising out of" are "not words of narrow and specific limitation, but are broad, general, and comprehensive terms .... They are ordinarily understood to mean 'originating from,' 'having its origin in,' 'growing out of,' or 'flowing from,' or in short 'incident to, or having connection with' ...." *Red Ball Motor Freight v. Employers Mut. Liab. Ins. Co.*, 189 F.2d 374, 378 (5th Cir. 1951); *Cont'l Cas. Co. v. City of Richmond*, 763 F.2d 1076, 1080 (9th Cir.1985) (holding that the term "arising out of" means more than causation). In other situations, courts have held that meaning of "arise out of" is

"comparable or analogous to whether certain actions can be said to be the legal, or proximate cause ...." *Pizarro v. Hoteles Concorde Int'l, C.A.*, 907 F.2d 1256, 1259 (1st Cir.1990).

The Federal Circuit has held that the "operative phrase 'in connection with' is very sweeping in scope." *RAMCOR Servs. Group, Inc. v. United States*, 185 F.3d 1286, 1289 (Fed.Cir.1999); 1 OXFORD ENGLISH DICTIONARY 571 (compact edition 1971) (defining connection as "The condition of being related to something else by bond of interdependence, causality, logical sequence, coherence, or the like; relation between things one of which is bound up with, or involved in, another."). Under other regulatory schemes, various circuits have held that "the phrase 'in connection with' expresses some relationship or association, one that can be satisfied in a number of other ways such as a causal or logical relation or other type of relationship." *United States v. Loney*, 219 F.3d 281, 284 (3rd Cir.2000); *United States v. Thompson*, 32 F.3d 1, 7 (1st Cir.1994) ("The phrase 'in connection with' should be interpreted broadly ...."); *United States v. Wyatt*, 102 F.3d 241, 247 (7th Cir.1996) ("the meaning of the phrase 'in connection with' should be construed expansively.") (citing *Smith v. United States*, 508 U.S. 223, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993)).

However, defendant argues that the Secretary did not make a determination that the fees either arose out of or were connected to the 1934 reservation litigation. The government contends that the Secretary made a factual determination that the invoices failed to establish that the following claims met either category: 1) Hopi Eagle Feather Case; 2) Illegal Navajo Construction in Statutory Freeze Area; and 3) 16 Trespassing Goats (and other Moenkopi jurisdictional issues). In a July 6, 1999 letter to the Department, plaintiff's counsel had asserted that the work on these matters "were necessary to the prosecution of the 1934 Reservation Liti-

following: (1) Fees of the clerk and marshal; (2) Fees of the court reporter for all or any part of the stenographic transcript necessarily obtained for use in the case; (3) Fees and disbursements for printing and witnesses; (4) Fees for exemplification and copies of papers necessarily obtained for use in the case; (5) Docket fees under section 1923 of this title; (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title."

gation and often involved pleadings and motions practice in that docket." July Decision at 8, n. 3. However, the Department concluded that "[w]ithout further information, e.g. copies of pleadings and other documents, it is not evident from the billing records submitted to the Department that these are reimbursable under § 640d–7(e)." *Id.* at 8.

Plaintiff has the burden of submitting evidence that the fees submitted are reasonable. *See Blum,* 465 U.S. at 897, 104 S.Ct. 1541. Under the EAJA, this Court has held that the records must be "in sufficient detail that a neutral judge can make a fair evaluation of the time expended, the nature and the need for service, and the reasonable fees to be allowed." *Martin v. United States,* 12 Cl.Ct. 223, 227 (1987) (citing *Hensley,* 461 U.S. at 429, 103 S.Ct. 1933), *vacated in part on other grounds,* 852 F.2d 1292 (Fed.Cir.1988). However, "an attorney 'is not required to record in great detail how each minute of his time was expended', but 'at least' 'should identify the general subject matter of his time expenditures.'" *Applegate v. United States,* 52 Fed. Cl. 751, 768 (2002) (quoting *Hensley,* 461 U.S. at 437, n. 12, 103 S.Ct. 1933.).

Plaintiff argues that the fees spent on identifying potential violations of the statutory freeze on development on land involved in the litigation was directly related to the 1934 reservation litigation. *See e.g., Masayesva v. Zah,* 816 F.Supp. 1387, 1415–1417 (D.Ariz. 1992) (lifting freeze because "Hopi Tribe pointed to only three Bennett Freeze violations of new construction, versus replacement of old homes or repairs. All three were located within a prior use area."). Plaintiff also contends that fees spent on disputes regarding its right to engage in religious ceremonies was litigated in the 1934 reservation litigation. *See e.g., Masayesva v. Zah,* 65 F.3d 1445, 1455 (9th Cir.1995) ("The district court must determine whether the eagle feather gathering and other religious hunting and gathering areas are sufficiently identifiable and subject to demarcation of boundaries so that the Hopis were 'located' there in 1934."). While some of these matters may have been spent on litigation within the District Court regarding the 1934 reservation, it

is not clear that plaintiff provided documents to the Secretary to support this claim. The Secretary held that he could not determine from the billing records submitted the nature or need of the services provided, nor how they were related to the litigation. In the absence of such a showing, this Court cannot hold that it was unreasonable for the Secretary to deny payment where plaintiff failed to provide the documents as requested.

Plaintiff argues that the Department admitted that these matters were related to the 1934 reservation litigation when it approved its attorney contract. The tribe contends that the contract authorized its counsel to work only on matters related to the 1934 litigation. However, at that time the Secretary cannot make a determination as to whether the fees actually charged would be related to the litigation or appropriate for reimbursement. That decision can only be made when the fees are actually submitted. Additionally, the Secretary had not made a final determination with regard to the invoices submitted until the July 16, 1999 decision.

The Secretary's July decision also denied fees for legislative expenses because "640d–7(e) was intended only for reimbursement of attorney fees and expenses related to litigation of the 1934 reservation boundaries, and as such would not include attorney fees for work on legislation." July Decision at 10. Defendant argues that the Secretary's decision is consistent with the plain language of the statute which limits reimbursement to payment of litigation fees. Plaintiff submits that these charges were necessary to avoid prejudice to its position in the litigation. The tribe asserts that these expenses were incurred in opposing efforts by the Navajo Nation seeking to have Congress modify or repeal the statutory freeze while litigation was pending.

Although these expenses may have been helpful to plaintiff's litigation, they are not recoverable under the statute. In the Settlement Act, Congress was concerned with the reimbursement of reasonable fees and expenses of litigation incurred in the proceedings before the District Court and any appellate review. It did not intend that the tribes

involved in the litigation could seek reimbursement for items claimed on account of fees paid to attorneys in the matter of securing the passage or defeat of any legislation.

### Conclusion

It is "well settled that the United States cannot be charged with interest, except where liability thereof is clearly imposed by statute or assumed by contract." *New York Guardian Mortg. Corp. v. United States*, 916 F.2d 1558, 1560 (Fed.Cir.1990) (citing *Smyth v. United States*, 302 U.S. 329, 353, 58 S.Ct. 248, 82 L.Ed. 294 (1937)); 28 U.S.C. § 2516(a). In *Peoria Tribe v. United States*, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968), the Supreme Court held that interest may be included in a damage award against the United States where the government breached its duty under a treaty to sell tribal lands at auction and accrue interest until distribution of the proceeds. *See Short v. United States*, 50 F.3d 994 (Fed.Cir.1995) (granting interest award where government breached its duty regarding the distribution of trust fund containing proceeds from sales of timber). However, plaintiff's claim does not involve a fund held in an Indian Money, Proceeds for Labor ("IMPL") account and is not subject to statutory requirement to accrue interest. *See* 25 U.S.C. § 161(b). Therefore, plaintiff is not entitled to interest on its claims under § 640d–7(e).

Accordingly, if jurisdiction were present to resolve the claims presented, plaintiff would be entitled to judgment in the amount of $2,800,169.44, consisting of pre–1990 fees in the amount of $1,798,620.44, and $1,548.50 in facsimile/telecopier expenses. However, this Court lacks jurisdiction because § 640d–7(e) is not a money-mandating statute and does not impose trust obligations on the government.

Therefore, it is **ORDERED** that:

1) Plaintiff's Motion filed February 20, 2001 to Strike the Secretary's January 18, 2001 decision is **DENIED**;

2) Plaintiff's Motion for Summary Judgment is **DENIED**;

3) Defendant's Motion to Dismiss is **GRANTED** with final judgment to be entered dismissing the complaint with **NO COSTS** assessed.